## UNITED STATES
## COURT OF FEDERAL CLAIMS

GENERAL MOTORS CORP.         )
                            )
          Plaintiff,         )
                            )
v.                          )  Docket No. 00-40C
                            )
UNITED STATES,              )
                            )
          Defendant.         )


<u>Live Tape</u>

          (The following transcript was transcribed from a digital recording provided by the United States Court of Federal Claims to Heritage Reporting Corporation on May 23, 2012.)



Pages:  1 through 26

Place:  Washington, D.C.

Date:   May 18, 2012

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GENERAL MOTORS CORP.            )
                               )
          Plaintiff,           )
                               )
v.                             ) Docket No. 00-40C
                               )
UNITED STATES,                 )
                               )
          Defendant.           )

                               Friday,
                               May 18, 2012

                         Live Tape

          (The following transcript was transcribed from a
digital recording provided by the United States Court of
Federal Claims to Heritage Reporting Corporation on
May 23, 2012.)

          BEFORE:  HONORABLE NANCY B. FIRESTONE
                   Judge

          APPEARANCES:  (Via Telephone)

          On Behalf of Plaintiff:

          MARCIA G. MADSEN, Esquire
          CAMERON S. HAMRICK, Esquire
          Mayer Brown LLP
          1999 K Street, N.W.
          Washington, D.C.  20006-1101
          (202) 263-3274

APPEARANCES:  (Cont'd)

<u>On Behalf of Defendant</u>:

C. COLEMAN BIRD, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W., 8th Floor
Washington, D.C.  20530
(202) 307-0453

STEPHEN DULY, Esquire
Boston, Massachusetts

1      P R O C E E D I N G S

2                                          (10:06 a.m.)

3           THE COURT:  Well, good morning, everyone.

4      Mr. Bird, how are you?

5           MR. BIRD:  Good morning, Your Honor.

6           THE COURT:  And Mr. Hamrick, we have you

7      today?

8           MR. HAMRICK:  Yes, Your Honor.

9           THE COURT:  Okay.

10          MR. HAMRICK:  But Madsen should be coming in

11     here shortly.

12          THE COURT:  That's okay.  And who else do we

13     have on the phone, Mr. Bird?

14          MR. BIRD:  Well, from the government, Your

15     Honor, you have Stephen Duly from Boston.

16          THE COURT:  Okay.

17          MR. DULY:  Good morning, Your Honor.

18          THE COURT:  Good morning, Mr. Duly.  And

19     then I have a note that we have a Dan Dugan from --

20     no, we don't have anybody in-house from GM.

21          MR. HAMRICK:  Nobody from GM.

22          THE COURT:  You're doing it all?

23          MR. HAMRICK:  That's right.

24          THE COURT:  Okay.  Well, the reason I'm

25     chatting is, is now we've gotten to the point where

1    the status reports are a little too cryptic for me to

2    follow as to what's going on, where we're now looking

3    at the -- you know, kind of the first, second, and

4    third liability positions.  I'm not even sure what

5    that means and I'm trying to figure out what it is

6    that I can do so that we can get this case resolved

7    now that it's going on 12 years perhaps by the

8    conclusion of this one.  And I know we're talking

9    about getting an audit done by November 1, but the

10   deadlines here kind of keep slipping.

11        So, Mr. Bird, tell me in your view what is

12   exactly going on here because it sounds like you're on

13   a path to resolution, it's just a very slow one.

14        MR. BIRD:  Thank you, Your Honor.  We are

15   hopeful of being on a path to resolution.  I can

16   address the liability calculations and the government

17   share audit separately, if that would be helpful.

18        THE COURT:  Yeah, that's helpful because I'm

19   now losing what positions you're in and so forth, so

20   go ahead.

21        MR. BIRD:  Well, with respect to the

22   liability calculations, where we are is that after an

23   extensive period of data exchange in response to the

24   government's questions, GM provided its liability

25   calculations in October of 2010 and as originally

1    provided, they were the numbers only without a backup

2    and we requested the backup.  We requested additional

3    information.  And after I think a total of three

4    fairly lengthy meetings between the parties, including

5    the parties' actuaries, we had -- and one of those was

6    the last one, the most recent one was in December.

7            At that meeting, the government indicated

8    that based on the data then available and subject to

9    change, the calculations that GM -- the revised

10   calculations that GM had submitted I believe in I want

11   to say August or September of last year, they needed

12   to submit some revised calculations because we found

13   some mistakes in the calculations that they had

14   provided, that we had three issues.  I emphasize that

15   was our preliminary and tentative assessment at that

16   time.

17           And those issues are -- although there are

18   three issues, in fact, they boil down to two.  The

19   first issue is when were certain benefit improvements

20   actually adopted.  And the reason that the timing is

21   significant is that the segment closed on December 1,

22   1993 and certain benefit improvements were adopted

23   retroactive to October 1, 1993 -- that's just two

24   months before -- and we're trying to find out when

25   those benefit improvements were actually adopted.  And

1    this is a fairly significant dollar issue --

2            THE COURT:  Is that it's a fair amount of

3    deficit attributable to those changes?

4            MR. BIRD:  Yes.  It's approximately 15

5    million for the hourly plan that adds to the liability

6    and 11 million approximately to the salary plan.  So

7    it's about $26 million.  And we've asked for documents

8    that reflect the timing of actual adoption and GM has

9    provided some documents and we're reviewing them.

10           And there are really two issues from our

11   standpoint that relate to the timing issue.  The first

12   is were these amendments actually adopted before the

13   segment closing and we think that should be a factual

14   issue.  And the second issue I would say is primarily

15   a legal issue, which is even if they were adopted

16   before the segment closing, is the additional

17   liability properly includable in the CAS 413 segment

18   closing adjustments.

19           THE COURT:  Meaning because these are being

20   applied retroactively?

21           MR. BIRD:  Yes, Your Honor, and because the

22   Court has determined that the purpose of the segment

23   closing adjustment is to adjust the previously

24   determined pension costs to correct for past over- or

25   underestimates of pension costs.  And the fact that GM

1    decides right before its segment closing to increase

2    liabilities, it does not mean that the costs that were

3    previously charged to the government were not proper

4    or that they need to be adjusted in any way.

5          THE COURT:  Well, that sounds -- Mr.

6    Hamrick, that sounds fairly intelligent.  I mean --

7          MR. HAMRICK:  Your Honor, that's the first

8    I've heard of the legal argument.

9          THE COURT:  All right.  Well, that's good

10   then we've had this conversation.  I mean, that's at

11   least at first blush making sense to me, Mr. Bird.

12   All right.  So that's one -- so your concern is, is to

13   ensure that what's being done comports with the

14   purposes of the segment closing adjustment.  Okay.

15         MR. BIRD:  Exactly, as the Court has

16   determined.

17         THE COURT:  Well, and I think that's how the

18   reg reads, but yeah.

19         MR. BIRD:  And the second issue is one where

20   we really -- it's an issue that we raised in December

21   and GM has indicated it will provide its response and

22   we have not yet received the response.  And this is a

23   fairly down -- it's fairly deep in the actuarial

24   leads, but it's a fairly big dollar issue.  It's about

25   a $51 million issue.  And the issue -- and this

1    relates only to the hourly plan.  And GM has certain,

2    they're called grow-in benefits and GM's calculations

3    included in the calculation of the liability for the

4    grow-in benefits a service that employees performed at

5    the buyer, that is after they left GM and what they

6    call post-termination service.  And we have asked

7    where does the plan provide, the pension plan provide

8    for these payments of additional benefits based on

9    post-termination service.  And as I said, that's an

10   issue where we're awaiting to hear a response.

11            THE COURT:  Explain the -- I mean, is it the

12   same issue that you are saying legally bothers you

13   about the prior one, that these are things that were

14   never paid for in the first instance, but somehow now

15   have been triggered?  Tell me, put it in a legal

16   context for me.

17            MR. BIRD:  Okay.  It's a similar issue, Your

18   Honor.  The issue is what is the actuarial liability

19   of the plan.  If a plan does not provide for these

20   benefits, but GM by contract agreed with its workers,

21   the hourly workers to provide these benefits to them,

22   we would say, well, that's not an actuarial liability

23   that's properly part of the deficit.  That's a

24   contractual liability that GM undertook on its own.  I

25   guess to put in the plan, then it's not an actuarial

1    liability.

2              THE COURT:  Okay.  So the legal argument is

3    that it's -- all right, it's not part of the asset

4    calculation.  In both that hourly plan and the other

5    one, those are both also -- are we going through the

6    same issue of having to do composite accounting here

7    or did we have segments already established?

8              MR. BIRD:  This was composite accounting.

9    But the issue of composite versus segment accounting

10   generally relates primarily to the asset side.  On the

11   liability side, you presumably know --

12             THE COURT:  Yeah, you know who the people

13   are.

14             MR. BIRD:  -- who the people are.

15             THE COURT:  Yeah.

16             MR. BIRD:  So it's a matter of doing the

17   calculations, extremely complicated calculations, but

18   in theory you know who they are and you know which --

19             THE COURT:  Okay.

20             MR. BIRD:  -- benefits you have to have.

21             THE COURT:  All right.  So you're just

22   suggesting it's not the -- so this is an instance that

23   the problem exists in both instances on the liability

24   side?

25             MR. BIRD:  Yes, Your Honor.

1          THE COURT:  Okay.  All right.  So that is

2    now -- you gave these issues over to GM, you're

3    telling me, sometime in December and you're waiting

4    for positions to come back?

5          MR. BIRD:  Yes, Your Honor.  On the grow-in

6    issue, the second --

7          THE COURT:  Yeah.

8          MR. BIRD:  -- liability issue if you will,

9    on the timing of the benefits, we have gotten

10   documents from GM and GM has expressed its position in

11   a letter within the last couple of weeks that sets

12   forth its position as to why the timing of the benefit

13   improvements is not an issue and that the benefit

14   improvement should be included in the liabilities used

15   for the segment closing calculation.  But we have some

16   more work to do on that issue on our end to make sure

17   we understand GM's position and also make sure that

18   we've exhausted the factual inquiry.

19         THE COURT:  Okay.  All right.  So then we

20   have the -- when you're talking about the Teledyne

21   share, help me understand that audit that you believe

22   will be complete.  The Teledyne share meaning you're

23   trying to deal with the issue of --

24         MR. BIRD:  What portion of the deficit is

25   the government's responsibility.

1          THE COURT:  Yes.  But are you also dealing

2     at the same time with the fixed price, non-fixed price

3     issue?

4          MR. BIRD:  Oh, no.  The Court has resolved

5     that issue.

6          THE COURT:  No, but I mean, have the numbers

7     been resolved --

8          MR. BIRD:  Oh.

9          THE COURT:  -- in the auditing?

10          MR. BIRD:  Well, what we have -- the status

11     of the audit, Your Honor, is that on I believe it was

12     January 25 of this year, GM provided its government

13     share calculation, which it indicated and represented

14     complied with the Court's order regarding the

15     exclusion of fixed-price contracts.

16          THE COURT:  Okay.

17          MR. BIRD:  And that was provided in -- I

18     have to say it's about the biggest notebook I've ever

19     seen.  It was about a six-inch notebook.  As the Court

20     is aware, we've gotten an auditor from DCAA, an

21     auditor who I think is particularly well suited for

22     this task because she conducted -- she audited the

23     government share calculation for the segment closing

24     of the Allison transmission segment, which GM sold

25     much more recently.  I believe it was about four or

1      five years ago.

2              THE COURT:  Okay.

3              MR. BIRD:  But she has done that.  And she's

4      already spent almost two weeks and two separate trips

5      at the DCAA office in Detroit, the Great Lakes branch

6      office.  On one of those trips, she met with GM's

7      representatives and GM's counsel at the entrance

8      conference.  I think that was in late March.  And

9      she's been busy locating the relevant records in the

10     government's hands in order to avoid posing any

11     unnecessary burden on GM.  And I think she has -- at

12     this point, she has done that except for records that

13     may possibly be at the DCAA office in Indianapolis.

14             THE COURT:  All right.

15             MR. BIRD:  That was the office that had

16     responsibility for the Allison gas turbine division.

17     And the parties have agreed on a process by which she

18     would submit questions and we anticipate that she will

19     submit some questions to GM possibly as early as next

20     week.  We're hoping to get them out next week.  And

21     that would be a very similar process.  They would go

22     directly to GM, simultaneous copies to GM counsel.

23             THE COURT:  Okay.  So if I'm understanding

24     it correctly, we're getting close to coming up with a

25     ratio.

1          MR. BIRD:  Right.

2          THE COURT:  And what we have outstanding are

3     questions as to what is the size of the deficit.  I'm

4     not gathering from what you're telling me that there's

5     a lot of dispute over the assets.  What I'm hearing

6     is, is that there's a dispute over the extent of the

7     liability so that we'll have a deficit number but that

8     we're making progress on the ratio.

9          MR. BIRD:  Your Honor, I would say I think

10    we're making progress on liabilities, too, but perhaps

11    --

12         THE COURT:  Okay.

13         MR. BIRD:  -- not as fast as any of us would

14    like.

15         THE COURT:  All right.  But am I right to

16    say that the issue of the asset allocation has been

17    resolved?

18         MR. BIRD:  Well, Your Honor, it's been

19    preliminarily resolved based on the data that was then

20    available.  I mean, our view is we don't have a deal

21    until we have a deal.

22         THE COURT:  I understand.

23         MR. BIRD:  And we're not at that point where

24    we can say that that issue was resolved at the table,

25    but we believe that we will be able to reach an

1     arrangement on the asset side and we hope on the

2     liability and the government share as well.

3          THE COURT:  Okay.  So let me just ask now

4     from, you know, the perspective of GM.  Mr. Hamrick,

5     so tell me, is this what you've just heard comport

6     with your understanding?

7          MR. HAMRICK:  That's close, Your Honor.

8          THE COURT:  All right.  Fill me in on the

9     details.

10          MR. HAMRICK:  Ms. Madsen has walked in, but

11     --

12          THE COURT:  Yeah, go ahead.

13          MR. HAMRICK:  -- I can give a quick overview

14     of some of the issues that Mr. Bird talked about.

15     They did give us three positions at our December

16     meeting.  We responded to two.  In a previous email, I

17     believe the government took the position that only

18     GM's board of directors could authorize changes to the

19     hourly and salary plans.  And what we gave the

20     government in our response to two of the three issues

21     were board of directors meetings from November 1,

22     1993, a month before the segment closed, formally

23     adopting the changes that are the subject of the $15

24     million and the $11 million.  So GM agreed

25     significantly in advance of selling the Allison

1          segment to adopt these increased liabilities.

2                    On the grow-in issue, it's become very

3          difficult to find somebody from that time period who

4          knows about these issues and the --

5                    THE COURT:  What does the grow-in issue

6          mean?

7                    MR. HAMRICK:  The grow-in issue, as I

8          understand it, is a term that's used actuarially to

9          talk about eligibility to receive certain pension

10         benefits.  And as I understand it, and I really have

11         to tell you, I'm not qualified to give you the

12         technical details, but eligibility counted at GM and

13         at the buyer was together determined eligibility for

14         certain benefits that separately a pension plan member

15         would not be able to get.  And GM agreed to take on

16         those additional liabilities, and we're in the process

17         of working hard to find one or more individuals from

18         that time period who can help us explain that.

19                   THE COURT:  It strikes me now that you

20         understand the government's position, and, Ms. Madsen,

21         welcome, that you know what -- I think what Mr. Bird

22         is expressing and it may apply to both of these issues

23         is ultimately what you're trying to do is to say had

24         we had perfect knowledge going forward, the government

25         would have always been paying the right amount of

1    money into -- you know, as its cost reimbursement on

2    these contracts, such that we would have, you know, a

3    zero balance that has to be allocated and that it's

4    looking back as to what those contributions had been

5    and figuring out did the government contribute too

6    much or too little.  I understand in cases like GM,

7    where they weren't fully-funded plans and so forth,

8    there's a little bit more complication associated with

9    that.

10            But what I'm concerned about is that we

11    think through the legal issues at the same time you're

12    trying to figure out the arithmetic of the liability

13    issues as well because it may be that there's some

14    serious liability risks there not meaning -- I mean,

15    in the sense of does it comport with the CAS as to

16    what you're thinking about.  So to the extent that

17    that is something on the legal side you folks can look

18    at, that may be something we have to tee up if there's

19    not an agreement, so that we can eventually get to an

20    agreement since we can't do a final resolution until

21    we have the assets resolved, the liability number

22    resolved, and then God willing the ratio resolved as

23    the government share.

24            All right.  So you're going to now

25    understand their legal position and work through that,

1    but you're exchanging information.  I understand about

2    the first one as to when the votes took place.  On the

3    second one, it sounds kind of confusing.  And with

4    regard to the government share ratio, where are you

5    folks?

6         MR. HAMRICK:  GM has submitted its package

7    on, I can't remember the exact date, in January of

8    this year.

9         THE COURT:  Okay.

10        MR. HAMRICK:  And as far as we know, DCAA is

11   auditing it.  What Mr. Bird just told us about that is

12   the extent of my knowledge about any --

13        THE COURT:  Okay.

14        MR. HAMRICK:  -- audit.  They did meet once

15   with a representative from GM, but I'm not sure where

16   this stands.  I do understand that at the meeting with

17   the GM representative, I probably will not get the

18   exact wording right, but the auditor indicated that

19   they would not rely or would not rely in a material

20   fashion on previous work performed by DCAA auditors in

21   connection with an earlier version of this claim

22   because for some reason it's being not reliable.  And

23   I'm not sure that should be the case.  I think that,

24   you know, to the extent that's part of the reason why

25   this may be extending out to November, I'm not sure

1     that should be justified.

2               MR. BIRD:  Your Honor, can I respond?

3               THE COURT:  Yes, why don't you tell me

4     what's going on there?

5               MR. BIRD:  I think what -- of course, I was

6     not present for the meeting with GM's representatives

7     and the auditor in March, but based on conversations

8     with the auditor, what I believe the auditor was

9     saying is that she cannot automatically assume that

10    the work that was previously done was done

11    satisfactorily.  She has to take a look at it and

12    confirm that it was done appropriately.

13              And also in terms -- although there was a

14    lot of work done on the audit before, the work that

15    was done on the government share side of the audit was

16    very limited.  In fact, all the -- I don't know that

17    there was any audit that was performed of any

18    submission of GM on the government share because the

19    government share information was derived from

20    information provided -- I think within DCAA, they call

21    it an assist audit.  And the Indianapolis office

22    provided information about the calendar year 1993 cost

23    reimbursable share of the Allison division's sales to

24    total sales in a memo and that's what went into the

25    DCAA audit report that was issued on June 2, 1999.

1          So there really is no -- it's not like we're

2     reinventing the wheel.  There was no wheel, if you

3     will, that was created before.

4          THE COURT:  Well, all right, I appreciate

5     that.  I mean, look, ultimately what we're trying to

6     do is move this thing along and I'm trying to figure

7     out the leverage that I might have to have that

8     happen.  And I'm not suggesting that all of you were

9     not working diligently.  And it sounds like this

10    woman, who's very familiar with GM and did this other

11    audit, probably is a better person in terms of

12    everyone's comfort on the reliability of her work and

13    so forth.  But what I want to make sure is that we're

14    getting closer.

15          You're giving me some assurance, Mr. Bird,

16    on the asset side, there's a little bit of closeness.

17    I'm getting some assurance that at least you're teeing

18    up the liability stuff and that we are on our way to a

19    resolution of the ratio.  What I was a little bit

20    concerned about is not speaking to you folks for six

21    months and finding out we're in the same place.  And

22    so let me ask GM as the Plaintiff, is there some

23    deadline that you'd like to see for resolving any

24    outstanding legal questions with regard to coming up

25    with a set of final numbers?  I mean, is there

1     something that you have with your client in mind?

2           MR. HAMRICK:  Your Honor, I think that given

3     that we've just learned of the government's legal

4     argument on the two liability issues with the two

5     million and the 11 million, my guess is, you know,

6     without having dug into this, that this will turn in

7     part on the actuarial mechanics of how these increased

8     liabilities were implemented.  That will be a

9     consideration --

10         THE COURT:  Okay.

11         MR. HAMRICK:  That we're going to want to

12    look at.  And so clearly as a factual matter, I need

13    to understand that.  And we understand where you're

14    coming from on making sure that we comply with the CAS

15    and applicable law.  We just need a little time to do

16    that since we've just learned of that.

17         THE COURT:  Okay.

18         MR. HAMRICK:  On the grow-in side, it may be

19    that the same or a similar legal issue applies.  So we

20    would be working hard on that front.  But, factually,

21    as I said, we're finding it difficult to find someone

22    who knows about this.  But we are working very hard to

23    do that and we're hopeful that we are going to be able

24    to find somebody in the near future and that will move

25    it along.

1      THE COURT:  All right.  So what I'm going to

2 do, Mr. Bird --

3      MS. MADSEN:  Your Honor?

4      THE COURT:  Yes, Hi, Ms. Madsen.  How are

5 you?

6      MS. MADSEN:  I'm sorry to interrupt, but I

7 thought for a minute there you were being a mind

8 reader because there's something else that's popped up

9 here.  And I think what we'd like to do is maybe set a

10 time 60 days from now or whatever to get back to you

11 and see if we need the Court's help to resolve any

12 legal issue.  Can we do that?

13      THE COURT:  Yes.  That's what I was looking

14 at in fact.  We're in the same place.  We were going

15 to --

16      MS. MADSEN:  Your Honor?

17      THE COURT:  Yes?

18      MS. MADSEN:  The thing I wanted to advise

19 the Court of is, I mean, the length of time the

20 matter's been pending is getting to be an issue.  And

21 I told Mr. Hamrick and Mr. Bird earlier this morning,

22 we got a note from the purchaser, Rolls Royce, and

23 this is actually the existence of an open contract,

24 very, very recently here indicating that the Defense

25 Contract Management Command -- or Agency, I'm sorry,

1    DCMA has identified what we believe is the or

2    certainly the most promising of the existing open

3    contract and has requested that -- well, expressed its

4    intention to de-obligate funds from that contract and

5    has requested a response from us by June, meaning the

6    purchaser, Rolls Royce and us by June 1.  Obviously,

7    given what the Circuit has to say about the need for

8    an open contract, we would not want the government to

9    move abruptly here and foreclose that contract.

10          THE COURT:  Right, because you would need a

11   mechanism for resolving this.

12          MS. MADSEN:  Right.

13          THE COURT:  Yes.  Although given what the

14   Circuit has also said, does GM not somewhere else in

15   the word have another government contract anywhere?

16          MS. MADSEN:  GM has some other government

17   contracts.  This may be -- and we can't tell you with

18   any certainty here today, but we have certainly looked

19   for contracts from AGT that remain open.

20          THE COURT:  Okay.

21          MS. MADSEN:  And this is either one or one

22   of two --

23          THE COURT:  All right.  Okay.  Well that

24   puts a --

25          MS. MADSEN:  -- sensitive to this question.

1          THE COURT:  All right.  So that puts a

2   little bit of pressure and that's good.  So why don't

3   we do this, why don't you all file by August 1 a

4   status report indicating where we are?  And in my own

5   way, I'd like to look at these issues in terms of what

6   I have to resolve, as to what is the status of any

7   outstanding issues with regard to sort of any asset-

8   related questions and then what's the status with

9   regard to any outstanding liability-related questions

10   and the status then, Mr. Bird, on the audit --

11          MR. BIRD:  Yes, Your Honor.

12          THE COURT:  -- with regard to the ratios of

13   government share to be applied.  And then, finally,

14   Ms. Madsen, why don't you give me -- I mean, obviously

15   to the extent people are saying things have to close

16   up by June, we're not there as you well know, but what

17   the sort of a timeframe with regard to any contract

18   resolution, so that this can be folded into that.

19          MS. MADSEN:  Okay.  And so if we can't get

20   some sort of agreement with DCMA --

21          THE COURT:  Then you'll come to me quicker.

22          MS. MADSEN:  Right.

23          THE COURT:  Yes.  I mean, I would hope that

24   DCMA would appreciate the fact that this is not a --

25   this is an effort on everyone's part to work

1    expeditiously.  And, hopefully, you know, Rolls Royce

2    appreciates that as well.

3           MR. BIRD:  Your Honor, if I could just say

4    that we did hear about this today for the first time

5    from Mr. Hamrick, about a little bit more than an hour

6    before the hearing --

7           THE COURT:  Yeah.

8           MR. BIRD:  -- and we have already commenced

9    inquiries to find out what's going on.  And as Mr.

10   Hamrick explained it, the notice was because the funds

11   were expiring and there may be fiscal law issues here

12   that I certainly am not familiar with and not able to

13   advise the Court about today, but just wanted to raise

14   that possibility that there may be other issues

15   lurking in the weeds.

16          THE COURT:  Well, I'm hoping -- usually,

17   those things are triggered by October 1.

18          MR. BIRD:  Yes, Your Honor.

19          THE COURT:  So if we're talking on August 1,

20   we should still have at least some clue.  I mean, I

21   have some sense even working -- doing the work that I

22   do at the Court at times as to whether or not things

23   can be obligated and whether or not you have the

24   ability to kind of push the funds forward and so

25   forth.  So by then, you'll -- I mean, Ms. Madsen, if

1    it turns out you have less flexibility than you think,

2    there are fewer -- I mean, if there are not other

3    contract vehicles, I mean, this gives you an

4    opportunity to kind of focus on that issue, so we can

5    make sure you don't -- we don't miss out on an

6    opportunity to resolve things if that's the mechanism

7    we have to use.  Okay?

8            MS. MADSEN:  We appreciate that and we

9    appreciate Mr. Bird making an inquiry about that.

10           THE COURT:  Yes.  And usually those things

11   as I understand it, it's a fiscal year issue.  So it's

12   good to have a heads up on that.

13           Okay.  All right.  I'm going to issue an

14   order setting some of these dates with the

15   understanding that if something is happening with

16   regard to that other contract closeout, that you need

17   to let me know, you will let me know.

18           MS. MADSEN:  Yes.

19           THE COURT:  Okay.  Very good everyone.

20   Thank you.  Bye-bye.

21           (Whereupon, at 10:37 a.m., the hearing in

22   the above-entitled matter was concluded.)

23   //

24   //

25   //

<u>CERTIFICATE</u>

DOCKET NO.:  00-40C

CASE TITLE:  General Motors Corp. v. United States

HEARING DATE:  May 18, 2012


       I certify that the foregoing is a true and correct transcript made to the best of our ability from a copy of the official electronic digital recording provided by the United States Court of Federal Claims in the above-entitled matter.


Date:  May 23, 2012

_____

Theresa A. Rowell
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C.  20005-4018