# In the United States Court of Federal Claims

No. 00-40C
(Filed: October 10, 2013)*

**\*Opinion originally filed under seal on September 9, 2013**

|  |  |  |
|---|---|---|
| GENERAL MOTORS CORPORATION, | ) ) ) ) | Original Cost Accounting Standards ("CAS") 413.50(c)(12) segment closing adjustment; calculation of |
| Plaintiff, | ) ) | "actuarial liabilities" under CAS 413.50(c)(12); pension benefit |
| v. | ) ) | increases added shortly prior to segment closing do not result in |
| THE UNITED STATES, | ) ) | "inequitable" segment closing calculation |
| Defendant. | ) ) ) | |

    *Marcia G. Madsen*, Washington, DC, for plaintiff. *Cameron S. Hamrick*, Washington, DC, of counsel.

    *C. Coleman Bird*, Civil Division, United States Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kirk T. Manhardt*, Assistant Director, for defendant. *Stephen R. Dooley*, Defense Contract Management Agency, Boston, MA, of counsel.

    *Richard D. Bernstein*, Washington, DC, for *amicus curiae* General Electric Company. *Mei Lin Kwan-Gett* and *Howard Stanislawski*, Washington, DC and *Alan C. Brown*, McLean, VA, of counsel.

## OPINION

**FIRESTONE**, *Judge*.

    Pending before the court is plaintiff General Motor Corporation's ("GM") motion for partial summary judgment in support of its use of the December 1, 1993 segment closing date in its segment closing calculation for the Allison Gas Turbine segment

("AGT"), and the government's motion for partial summary judgment that use of the

December 1, 1993 date results in an "inequitable calculation" under Cost Accounting

Standards ("CAS") 413.50(c)(12) (1978)[1] because it incorporates into the AGT segment

closing adjustment calculation certain pension liabilities adopted shortly prior to the sale

of AGT.  The government seeks a ruling requiring GM to use September 30, 1993 as an

alternative segment closing date in order to exclude these pension liabilities.  For the

reasons that follow, GM's motion for partial summary judgment is **GRANTED**, and the

government's motion is **DENIED**.

## I.      BACKGROUND

The facts surrounding GM's sale of the AGT segment are discussed in this court's

prior decisions.  See Gen. Motors Corp. v. United States, 66 Fed. Cl. 153, 154 (2005);

Gen. Motors Corp. v. United States, 78 Fed. Cl. 336, 337 (2007).  The court does not

repeat all of those facts here.  The following facts, relevant here, are undisputed.

GM sold the AGT segment on December 1, 1993.  Prior to the sale, GM sponsored

two defined benefit pension plans:  one for hourly employees ("Hourly Pension Plan")

and one for salaried employees ("Salaried Pension Plan").  Gen. Motors, 66 Fed. Cl. at

155.  AGT employees participated in both Pension Plans.  Because of the flat-rate

structure of the Hourly and Salaried Pension Plans, GM regularly amended the Pension

Plans to add "benefit improvements," which increased the amounts of benefits payable to

---

[1] The segment closing at issue in this case predates the 1995 revisions to the CAS and as such is governed by the original version of CAS 413, which was promulgated in 1977 and became effective in 1978.  See Gen. Motors Corp. v. United States, 66 Fed. Cl. 153, 154 n.1 (2005). References to CAS 413 are therefore to the original CAS unless otherwise noted.

plan participants and therefore added actuarial liabilities to the Pension Plans.  The benefit improvement amendments to the Hourly and Salaried Pension Plans, adopted on November 1, 1993 and made retroactively effective October 1, 1993, are the only improvements now at issue.

The December 1, 1993 sale of AGT constituted a segment closing which triggered certain obligations on the part of GM under CAS 413.  As discussed at length in various decisions, the CAS regulations were promulgated to provide uniformity in how contractors measure and allocate costs to government contracts.  Gates v. Raytheon Co., 584 F.3d 1062, 1064 (Fed. Cir. 2009); Allegheny Teledyne Inc. v. United States, 316 F.3d 1366, 1370 (Fed. Cir. 2003).  The segment closing obligations under CAS 413 must be read in tandem with CAS 412, which governs how a contractor determines its pension costs using actuarial estimates of the pension plan's anticipated earnings and benefit payments.  Allegheny Teledyne, 316 F.3d at 1371.  CAS 412 limits the amount of increased liability associated with a pension plan amendment that can be included in a contractor's annual pension cost calculation and charged to the government.  In particular, CAS 412 does not permit the entire amount of the increased liability to be included in the annual pension cost calculation for the year in which the plan amendment was adopted.  Instead, CAS 412 requires that any unfunded actuarial liability resulting from a plan amendment must be amortized over not less than 10 and not more than 30 years.  CAS 412.50(a)(iii).

The CAS also allow for adjustments to a contractor's pension costs in certain circumstances in order to prevent volatility in the amounts of pension costs charged to the

3

government.  DIRECTV Grp., Inc. v. United States, 670 F.3d 1370, 1372-73 (Fed. Cir. 2012).  Under CAS 413, the actuarial gains or losses of a pension plan, which represent differences between the estimates and the actual experience of the pension plan, are amortized in equal annual installments over a fifteen-year period.  Id.; CAS 413.50(a).  This adjustment process is interrupted, however, when a business segment is closed— "i.e., whenever the segment's contracts have become separated or closed off from the pension costs such that there are no future periods in which to adjust . . . [the] pension costs."  DIRECTV, 670 F.3d at 1373 (internal quotation omitted).  In that case, CAS 413.50(c)(12) provides for adjustments to pension costs to account for a closed segment's pension surplus or deficit.  Id.; Allegheny Teledyne, 316 F.3d at 1371.  Specifically, when a segment closing occurs, CAS 413 provides that a contractor must calculate the difference between the market value of the assets in the pension plan allocated to the segment and the actuarial liability for the segment, to determine the amount by which the plan is over- or under-funded:

> If a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. . . . The calculation of the difference between the market value of the assets and the actuarial liability shall be made as of the date of the event (e.g., contract termination) that caused the closing of the segment.  If such a date cannot be readily determined, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date. The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.

CAS 413.50(c)(12).  If this difference is positive, the government may be entitled to the share of this surplus from the contractor.  See Raytheon Co. v. United States, 105 Fed. Cl.

236, 239-40 (2012).  If the difference is negative, the contractor may be entitled to a share of the deficit from the government.  See id.  "In short, [when a segment closes,] the Government and contractor . . . adjust the outstanding pension obligations by allocating any then-existing surplus or deficiency between them."  DIRECTV, 670 F.3d at 1373.  It is undisputed that, in this case, the calculation of the segment closing adjustment yields a deficit that must be allocated between the government and GM.

The parties' instant dispute centers on the calculation of the "actuarial liability" of the AGT segment under CAS 413.50(c)(12).  Specifically, the parties disagree as to whether the segment closing calculation in this case must be made as of the segment closing date, December 1, 1993, which would include the actuarial liabilities associated with the November 1993 benefit improvements, or whether a different date must be used on the grounds that including the November 1993 benefit improvements results in an "inequitable calculation" within the meaning of CAS 413.50(c)(12).  Although the Defense Contract Audit Agency ("DCAA") and the Defense Contract Management Command ("DCMC") (now the Defense Contract Management Agency) did not take issue with the inclusion of the November 1993 benefits or the December 1, 1993 segment closing date in their reviews of GM's segment closing adjustment, the government now contends that including the November 1993 benefit improvements in the segment closing calculation violates CAS 413.50(c)(12).  The government argues that it is "inequitable" to include benefits that were not historically provided under the subject plans and for which the government did not incur costs in the segment closing adjustment.

Briefing on this issue was completed on July 22, 2013, and oral argument was held on September 3, 2013.  The court now turns to the parties' arguments.

## II.      STANDARD OF REVIEW AND RULES OF INTERPRETATION

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Rule 56(a) of the Rules of the Court of Federal Claims; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49 (1986); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008).  A material fact is one that "might affect the outcome of the suit under the governing law," and an issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In considering the existence of a genuine issue of material fact, a court must draw all inferences in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the movant has shown that no genuine issue of material fact exists, the party opposing summary judgment must demonstrate that such an issue, in fact, does exist. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  To establish a genuine issue of material fact, a party "must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient."  Radar Inds., Inc. v. Cleveland Die & Mfg. Co., 424 F. App'x 931, 936 (Fed. Cir. 2011) (quoting SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1116 (Fed. Cir. 1985)) (internal quotation omitted).  A party asserting that a fact is genuinely disputed must support its assertions with actual evidence.  Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.

2007).  Where there is doubt as to the existence of a genuine issue of material fact, that

doubt must be resolved in favor of the nonmovant.  Unigene Labs., Inc. v. Apotex, Inc.,

655 F.3d 1352, 1360 (Fed. Cir. 2011) (citing Ortho-McNeil Pharm., Inc. v. Mylan Labs.,

Inc., 520 F.3d 1358, 1360-61 (Fed. Cir. 2008)).  With respect to cross-motions for

summary judgment, each motion is evaluated on its own merits and reasonable inferences

are resolved against the party whose motion is being considered.  Marriot Int'l Resorts,

L.P. v. United States, 586 F.3d 962, 968-69 (Fed. Cir. 2009).

     Summary judgment is particularly appropriate where the issue decided

fundamentally concerns questions of law.  Huskey v. Trujillo, 302 F.3d 1307, 1310 (Fed.

Cir. 2002) (citing Dana Corp. v. United States, 174 F.3d 1344, 1347 (Fed. Cir. 1999)

("Summary judgment was appropriate here because no material facts were disputed,

many being stipulated, and the only disputed issues were issues of law.")). The proper

interpretation of the CAS is a question of law.  See Rumsfeld v. United Techs. Corp., 315

F.3d 1361, 1369 (Fed. Cir. 2003).

     In making legal interpretations of the provisions and requirements of the CAS, the

court looks to any guidance the CAS Board ("CASB") has published.  See Perry v.

Martin Marietta Corp., 47 F.3d 1134, 1137 (Fed. Cir. 1995).  In addition, the court will

read the subject CAS section "together with the other provisions of the regulation" in

order to ensure that the court construes the CAS provision in context.  Gen. Elec. Co. v.

United States, 92 Fed. Cl. 798, 812 (2010).  Finally, to the extent the CAS requirements

are not clear from the face of the regulation or available CASB guidance, the court will

consider how various actuarial terms found in CAS 413 are used in practice to guide its

legal interpretation of the CAS.  <u>Raytheon</u>, 105 Fed. Cl. at 271.

## III.   DISCUSSION

As noted, the parties disagree as to whether the actuarial liabilities associated with

the November 1993 benefit improvements should be included in the CAS 413.50(c)(12)

segment closing adjustment calculation.  GM included the subject benefits in its segment

closing adjustment calculation because the benefits were in place as of the December 1,

1993 segment closing date.  The government contends that including the November 1993

benefit improvements results in an "inequitable calculation" of the AGT segment's

actuarial liability and thus argues that under CAS 413.50(c)(12) another date must be

selected.  Section 413.50(c)(12) states in relevant part:

> The calculation of the difference between the market value of the assets and
> the actuarial liability shall be made as of the date of the event (e.g., contract
> termination) that caused the closing of the segment.  If such a date cannot
> be readily determined, <u>or if its use can result in an inequitable calculation,
> the contracting parties shall agree on an appropriate date</u>.  The difference
> between the market value of the assets and the actuarial liability for the
> segment represents an adjustment of previously-determined pension costs.

CAS 413.50(c)(12) (emphasis added).

The government bases its argument not on the plain language of CAS

413.50(c)(12), but on its purpose.  The government concedes that there is nothing in the

language of the CAS or its regulatory history which defines an "inequitable calculation."

In such circumstances, the government argues that the "inequitable calculation" provision

must be read in light of the "purpose" of the segment closing provision.  The government

contends that the purpose of the segment closing adjustment is to identify and correct for

government over- or under-contributions to a contractor's pension costs due to past "actuarial miscalculations."  In this case, the government argues that, because the November 1993 benefit improvements were so new, the government never contributed to them, and thus there are no "actuarial miscalculations" associated with benefit improvements.  The government further argues that, because the plan amendments were made so soon before the segment closing, the government never received any "benefit," such as increased productivity on government contracts, from providing GM's workers with increased pension benefits.  As such, the government concludes, it is "inequitable," as a matter of law, to include these new obligations in the CAS 413 segment closing calculation.  The government proposes that the segment closing calculation should be made as of September 30, 1993, at the end of GM's pension-plan year and before the November 1993 benefit improvements became effective, to avoid an "inequitable" result.

GM moves for summary judgment that the segment closing adjustment calculation was properly made as of the December 1, 1993 segment closing date to include the November 1993 benefit improvements.  GM argues that the language of CAS 413.50(c)(12) does not require, as the government contends, that the segment closing calculation consist of or be limited to only previously-determined pension costs charged to the government.  GM argues that the segment closing adjustment should include all legitimate pension obligations incurred as of the date of the closing and that there is nothing "inequitable" about including pension obligations that the DCAA and DCMC accepted without comment and that are no different from other pension benefits the government has accepted.  GM further contends that there is no prohibition against

including recently adopted pension improvements in the segment closing calculation

under CAS 413.50(c)(12).  Rather, GM argues, the plan amendments were regular, plan-

wide amendments that were made in the ordinary course of business, in conjunction with

GM's company-wide union negotiations, and were not specifically implemented because

of the impending AGT segment closing.  GM concludes that because there is no bad faith

or exceptional circumstances surrounding the adoption of the November 1993 benefit

improvements or the AGT segment closing, including the benefit improvements in the

segment closing calculation is not "inequitable."

After consideration of the parties' arguments, the court agrees with GM.[2]  While

the court shares the government's concern that large voluntary pension benefit increases

adopted immediately prior to a segment closing might give rise to an "inequitable

calculation" in certain situations,  the court does not agree that all pension benefit

increases adopted shortly prior to segment closing are "inequitable" or that including

these recent benefits in the segment closing calculation is per se inconsistent with the

"purpose" of a segment closing adjustment.  Nor does the court agree that including the

November 1993 benefit improvements results in an "inequitable" segment closing

calculation in this case.  Therefore, for the reasons discussed more fully below, the court

---

[2] In addition to the arguments set forth above, GM also argues that the government's concession with regard to similar benefit improvements should be treated as judicial admissions.  GM further argues that the government's proposed alternative date is arbitrary for several reasons. The court does not need to reach these arguments in order to resolve the parties' cross-motions. However, the court specifically rejects GM's argument that, absent agreement between the parties, the only date to be used in CAS 413.50(c)(12) is the date of the segment closing.  Pl.'s Resp. at 7.  A lack of agreement between the parties does not foreclose the use of an alternative date.  Rather, the plain language of the segment closing provision mandates that, if the segment closing date produces an "inequitable calculation," the parties must agree on an alternative date.

finds that GM's decision to include the November 1993 benefits in its calculation was lawful.

**A.    A segment closing adjustment calculation performed in December 1993 which includes benefits adopted in November 1993 is not "inequitable."**

**1.    The "purpose" of the segment closing adjustment does not require the exclusion of the November 1993 benefit improvements from AGT's segment closing liability.**

As discussed above, the court relies on the language, structure, and regulatory history of the CAS to interpret CAS provisions.  <u>Allegheny Teledyne</u>, 316 F.3d at 1373. The parties have not identified and the court has not found in the plain language of the segment closing provision or the regulatory history of the original CAS any express indication that actuarial liabilities added shortly prior to segment closing, such as the actuarial liabilities added by the November 1993 benefit improvements at issue here, must be excluded from the segment closing calculation.

Recognizing that nothing in the plain language of the CAS bars the inclusion of newly-adopted plan benefits in the segment closing calculation, the government argues inclusion of these benefits falls outside the "purpose" of the segment closing calculation. In support of this view, the government relies on this court's decision in <u>Teledyne, Inc. v. United States</u>, which states that

> the CAS 413 segment closing adjustment was intended to account for the actuarial miscalculations of pension costs charged to the government in past accounting periods where there are no future accounting periods available for corrections.  The purpose of the CAS 413 segment closing adjustment is to identify where the government may have over or under contributed to pension costs under prior contracts.

50 Fed. Cl. 155, 180 (2001), aff'd Allegheny Teledyne, 316 F.3d at 1381.  Based on the above-quoted language, the government argues that including the November 1993 benefit improvements in the segment closing calculation is "inequitable" because the government had not incurred costs for these benefit improvements in the past and that, therefore, there are no past "actuarial miscalculations" associated with the November 1993 benefit improvements to adjust.  A calculation that violates the "purpose" of the segment closing adjustment, the government argues, is "inequitable" under CAS 413.50(c)(12).

The court disagrees with the government that the "purpose" of the segment closing adjustment excludes the November 1993 benefit improvements in this case.  Contrary to the government's assertion, the "purpose" of the segment closing calculation does not work to exclude benefit improvements for which the government did not incur costs. While the CASB intended that the "purpose" of the segment closing adjustment calculation was to identify and correct for "actuarial miscalculations" of pension costs that could not be adjusted in future periods, the CASB further provided that this "purpose" would be accomplished by a straightforward calculation:  "the difference between the market value of the assets and the actuarial liability" of a closed segment. CAS 413.50(c)(12).  The plain language of the CAS reveals that this calculation was not meant, as the government urges, to include only certain previously-determined pension costs charged to the government.  Rather, CAS 413.50(c)(12) provides that the outcome of the segment closing adjustment calculation "represents an adjustment of previously-determined pension costs."  Id. (emphasis added).  The Preamble to CAS 413, commenting on the CAS 413.50(c)(12) segment closing provision, further states that:

> As a general rule, the Standard being promulgated today is based on the concept that material actuarial gains and losses applicable to a segment will be taken into account in future cost accounting periods in determining the costs for the segment.  However, a problem arises in cases where a segment is closed.  Because there are no future periods in which to adjust previously determined pension costs applicable to that segment, <u>a means must be developed to provide a basis for adjusting such costs</u>.  This adjustment is not an actuarial gain or loss as defined in the Standard. . . . The Board emphasizes that <u>the purpose of this provision is to serve as a basis for recognizing and adjusting costs previously allocated to the segment being terminated.</u>

Cost Accounting Standards for Adjustment and Allocation of Pension Cost, Preamble ("CAS 413 Preamble") § 12, 42 Fed. Reg. 37,191, 37,195 (July 20, 1977) (emphasis added).  According to the CASB, the segment closing adjustment calculation serves as a basis for adjusting "costs previously allocated to the segment being terminated."  Id. Because the November 1993 plan amendments include costs that are allocated to the AGT segment being terminated, the segment closing adjustment would include the previously-determined actuarial liabilities associated with the November 1993 benefit improvements.

Thus, nothing in CAS 413 or its regulatory history single out certain pension costs for exclusion, or limit the "actuarial liability" of a segment to only those liabilities accounted for during a certain period of time.  Instead, the CAS and its regulatory history recognize that a segment closing calculation is meant only to "represent" or "serve as a basis for" recognizing and adjusting a segment's previously-determined pension costs upon segment closing.  CAS 413.50(c)(12); CAS 413 Preamble § 12, 42 Fed. Reg. at 37,195.  In other words, the segment closing adjustment is not an exact adjustment of

prior incurred costs, but a means of allocating pension assets and liabilities taking into

account the full history of the relationship between the government and the contractor.

The "purpose" of the segment closing adjustment, therefore, does not require the

automatic exclusion of the November 1993 benefit improvements from AGT's segment

closing liability.  Indeed, the government has not objected to the inclusion of other

benefit improvements that also increased AGT's actuarial liability on segment closing but

had not been fully accounted for as past CAS pension costs.  Earlier GM plan

amendments—amendments made in 1992, for example—also increased the actuarial

liability of the AGT segment upon segment closing, but required only limited

government contributions due to the amortization requirements of CAS 412.  Yet, the full

amount of the actuarial liability for the 1992 plan amendment is included, without

objection by the government, in the segment closing calculation.  The government's

apparent concession with regard to these benefits undermines its position that the

inclusion of the November 1993 benefit improvements is "inequitable."  In short, as long

as the November 1993 benefit improvements were lawfully adopted as part of the subject

Pension Plans (which as discussed <u>infra</u> is not in question here), including those benefits

in the segment closing calculation is not inconsistent with the purposes of the CAS.

> **2.      The November 1993 benefit improvements were adopted as part
> of regular improvements to the Pension Plans and are not
> inherently "inequitable" under the CAS.**

First, the court disagrees with the government that inclusion of the November

1993 benefit improvements is "inequitable" because the government never received any

"benefit" of its own as a result of those benefit improvements, such as increased

productivity on government contracts.  To the contrary, GM pointed to evidence from the government's audit reports on the AGT segment that the November 1993 benefit improvements were intended to benefit employees who in the past had worked on GM government contracts, including AGT government contracts.  A 1998 DCMC Actuarial Report ("DCMC Report") evaluating GM's AGT segment closing calculation stated, in a section titled "Pension Deficit is Normal Consequence of Benefit Design," that benefits in the Hourly and Salaried Pension Plans were frequently increased because of the flat-rate benefit structure Pension Plans.  Pl.'s Mot., App. at A17.  The DCMC Report also included valuation charts, which indicated that these benefit increases were adopted on a regular basis.  Id., App. at A24-A25.  In light of this evidence, the government's argument that the November 1993 benefit improvements did not provide any intangible benefits to the government is not persuasive.  The pension increases applied to past work on AGT government contracts, were expected at regular intervals by Pension Plan participants, and thus contributed to productivity for AGT government contracts in the past.

Second, the court finds that the use of an alternative date under the segment closing provision is a regulatory "exception" to the general rule in CAS 413.50(c)(12) that the segment closing date must be used for the segment closing calculation, and that this exception must be construed "narrowly in order to preserve the primary operation of the provision."  Maracich v. Spears, 133 S. Ct. 2191, 2200 (2013) (quoting Commissioner v. Clark, 489 U.S. 726, 739 (1989)).  As discussed above, the segment closing provision sets forth a straight-forward calculation that requires the parties to use

the segment closing date in most circumstances.  Because either party could argue that

the use of the segment closing date produces an "inequitable" result in the event that that

date increases or decreases their segment closing obligation, a narrow interpretation of

the "inequitable calculation" exception is necessary to prevent the exception from

operating to "contravene the [regulatory] design" of the segment closing provision.

Maracich, 133 S. Ct. at 2200.  For this reason, the court reads the segment closing

provision to require that the segment closing calculation's "inequity" must be related to

"the date of the event (e.g., contract termination) that caused the closing of the segment."

CAS 413.50(c)(12).  Here, nothing drastic, such as a significant change in market

conditions, occurred on the date of the segment closing such that the use of that date

would be "inequitable."  In addition, there is no evidence before the court to suggest that

the subject changes to the Pension Plans were made to take advantage of the segment

closing date or that the changes were made for some other questionable reason relating to

the segment closing date.

     Here, the undisputed facts, as set forth in the DCMC Report concerning the AGT

segment closing makes clear that the November 1993 benefit improvements were

adopted in accordance with GM's normal business practice on a company-wide basis.

The DCMC Report recognized that GM pension plan amendments, including the

amendment at issue, were made on a regular basis since 1984, see Pl.'s Mot., App. at

A24-A25, in conjunction with the negotiation of collective bargaining agreements for its

hourly employees.  The DCMC Report characterized regular plan amendments as a

"normal consequence" of the benefit design of the Hourly and Salaried Pension Plans.

Id., App. at A17.  The DCMC Report further reveals that these plan amendments were incorporated at regular intervals in order to keep up with inflation—a purpose having nothing to do with the AGT segment closing.  Id., App. at A17, A24-A25.  Thus, the DCMC Report demonstrates that the 1993 plan amendment adopting the November 1993 benefit improvements was part of a long line of regular, company-wide plan amendments, and was not an unusual or exceptional event tied in any way to the segment closing date.

Finally, the court cannot ignore that the DCMC Report—which was subsequently incorporated in its entirety into a June 2, 1999 DCAA Audit Report—did not question GM's inclusion of the November 1993 benefit improvements in GM's segment closing calculation.  While the court agrees with the government that any legal interpretation of the CAS that the DCAA or DCMC may have made is irrelevant to the court's own interpretation of the CAS, Allegheny Teledyne, 316 F.3d at 1378, the DCMC and DCAA approval of GM's actuarial liability calculation demonstrates that, in practice, those charged with implementing the CAS did not question the inclusion of the November 1993 benefit improvements as "inequitable."  The DCMC Report recognized that benefit increases, like those at issue here, "produce a new unfunded liability that burdens the pension plan . . . ."  Pl.'s Mot., App. at A17.  The DCMC Report further includes as attachments AGT's October 1, 1993 actuarial valuations charts, which include the November 1993 benefit improvements.  Id., App. at A24-A25.  Thus, although recognizing the full extent of the actuarial liabilities associated with the November 1993 benefit improvements, the DCMC did not object to including those actuarial liabilities in

17

the segment closing calculation.  The DCAA Audit Report also did not object to the

November 1993 benefit improvements.  Id., App. at A125 ("We have incorporated the

results of the 5 November 1998 DCMC Actuarial Report on GM's Claim of Pension Cost

Adjustments Attributable to the AGT for the Hourly and Salaried Qualified Defined

Benefit Pension Plans in the results of audit section of this report and included in its

entirety as Appendix 2.").  These reports help to confirm that the November 1993 benefit

improvements were recognized by the government as benefits to be included in the CAS

segment closing calculation.

> **3.      The changes in the revised CAS confirm that the original CAS
> did not exclude the subject benefit improvements from the AGT
> segment closing adjustment.**

Finally, while the court is cautious to interpret the original CAS based on the

requirements of the new CAS, the court finds that, to the extent the new CAS is helpful in

determining the meaning of the original, the 1995 changes in revised CAS 413 support

the court's determination that GM correctly included the November 1993 benefit

improvements in its segment closing calculation.  In the revised CAS, the CASB

addressed the inclusion of pension plan improvements made shortly prior to the sale of a

segment in the segment closing adjustment calculation.  The revised version of the CAS

segment closing provision specifically retains the "inequitable calculation" language of

the original CAS, but also expressly provides for a 60-month phase-in of voluntary

pension plan improvements adopted in advance of a segment closing.  Revised CAS 413-

50(c)(12) provides:

[(c)(12)](iii) The [segment closing adjustment] calculation of the difference between the market value of the assets and the actuarial accrued liability shall be made as of the date of the event (e.g., contract termination, plan amendment, plant closure) that caused the closing of the segment, pension plan termination, or curtailment of benefits. If such a date is not readily determinable, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date.

(iv) Pension plan improvements adopted within 60 months of the date of the event which increase the actuarial accrued liability shall be recognized on a prorata basis using the number of months the date of adoption preceded the event date. Plan improvements mandated by law or collective bargaining agreement are not subject to this phase-in.

48 C.F.R. § 9904.413-50(c)(12)(iii)-(iv).

The revised CAS provision expressly changes the original CAS and suggests that the original CAS did not require exclusion of recent plan improvements from the segment closing adjustment. As this court and the Federal Circuit recognized in Allegheny Teledyne, clear changes made to the original CAS by the 1995 revisions should be presumed to change the CAS. 316 F.3d at 1380; see also DIRECTV, 670 F.3d at 1376. Thus, the CAS revisions suggest that the original CAS did not require the exclusion of recent plan improvements in the AGT segment closing adjustment. The concept of excluding or limiting recent plan amendments in the segment closing adjustment was not introduced into the CAS until it was revised in 1995.[3] For all of these reasons, the court

---

[3] The court also notes that the 1995 revisions do not subject all benefit improvements made shortly prior to segment closing to the phase-in requirement. Pension benefit improvements that are made pursuant to collective bargaining agreements are not subject to phase-in: "Plan improvements mandated by law or collective bargaining agreement are not subject to this phase-in." 48 C.F.R. § 9904.413-50(c)(12)(iv). This exception for collective bargaining agreements in the revised CAS further demonstrates that including recent pension benefit improvements is not per se "inequitable" under the CAS or inconsistent with the "purpose" of the CAS segment closing provision.

finds that the government is not entitled to summary judgment that use of the December 1, 1993 segment closing date is an "inequitable" segment closing calculation under the CAS.

> **B.     GM's use of the segment closing date does not give rise to an "inequitable calculation."**

As explained above, CAS 413.50(c)(12) requires the use of the segment closing date for the segment closing adjustment unless it will result in an "inequitable calculation."  Having rejected the government's objections to GM's use of the segment closing date of December 1, 1993, the court finds based on the plain language of CAS 413, the DCMC and DCAA audit and actuarial reports, the government's concessions with regard to other plan amendments that were not fully funded, as well as the above-discussed changes in the revised CAS, that GM's use of the December 1, 1993 sale date as the appropriate segment closing date is supported.  Thus, GM is entitled to summary judgment regarding its use of the December 1, 1993 date for its calculation.

## IV.   CONCLUSION

For the above-stated reasons, the government's motion for partial summary judgment for the selection of an alternative date for the segment closing calculation is **DENIED** and GM's motion for partial summary judgment in support of retaining the December 1, 1993 date for the segment closing adjustment is **GRANTED**.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge